Lawrence Gaines was tried and convicted at the March, 1913, term of the district court of Love county upon a charge of having murdered one W.A. Anglin, and his punishment fixed by the jury at death. The judge of the district court of Love county furnished the Governor of Oklahoma a certified transcript of the testimony and proceedings had at the trial. The Governor, on the 23rd day of September, 1913, transmitted the said record and all exhibits attached thereto to the Presiding Judge of this court, requesting an advisory opinion as provided by the statute, as to whether or not the formalities of the law had been in all things observed and complied with at the trial. To this request the Presiding Judge returns the following reply:
To the Governor of the State of Oklahoma:
The Presiding Judge of the Criminal Court of Appeals of Oklahoma, responding to your official communication of September 23, 1913, which presents for his consideration a certified copy of the record of the conviction of Lawrence Gaines, who was on the 25th day of March, 1913, by the judgment of the district court of Love county, sentenced to death in accordance with the verdict of a jury, returned upon his trial finding him guilty of the murder of W.A. Anglin; the trial court having on the 25th day of March, 1913, pronounced judgment and sentence, fixing Friday, May 23, 1913, as the day of execution, and according to information aliunde the record, the execution was stayed to October 24, 1913, says:
From an examination of the records of this court, I find that no appeal has been taken in said cause. The law has been interpreted by the court to contemplate an advisory opinion by the judges of this court or any one of *Page 376 
the judges thereof when an appeal has not been taken from a judgment and sentence of death. In this case there has been no appeal. Therefore, the opinion should be rendered as requested. In re Opinion of the Judges, 8 Okla. Cr. 467, 128 P. 734.
Ordinarily the only question I would be called upon to consider is whether or not there has been a compliance with all the formalities of law essential to the taking of human life, or, in other words, if the trial, conviction, and sentence of death upon the accused were in accordance with the law of the land. See Opinion of Judges, 3 Okla. Cr. 315, 105 P. 684. Upon a full and careful consideration of the record and testimony, I find that the information sufficiently and clearly charges the crime of murder. The instructions of the court are full and complete and clearly cover the law. There are few errors of any kind disclosed by the record and none of importance. While the record is comparatively free from error, a careful study of the transcript of the evidence and sworn statements attached compels the conclusion that the conviction and punishment inflicted by the jury is absolutely unwarranted. The only testimony which to my mind connects or tends strongly to connect the accused with the murder charged is the testimony given by an admitted accomplice, Boy Gaines. The reading of the record in this case and a companion case submitted by you in the same message with this transcript, together with certain exhibits that were not before the trial court, cannot but lead an impartial mind to the conclusion that Boy Gaines and Walter Willis were the murderers of W.A. Anglin. There is serious doubt about the accused, Lawrence Gaines, or any other person being even remotely connected with the crime. If this case were before the court on appeal, the writer would unhesitatingly insist on a reversal of the judgment, and the granting of a new trial, and would never consent to an affirmation of the death penalty as to Lawrence Gaines. Since there was no appeal, there is no way to afford relief and avoid mistakes by the infliction of the death penalty in this case, except a safe use and humane exercise of the executive prerogative. It is but fair to the trial court, however, to suggest that these observations are due, to some extent, to facts *Page 377 
disclosed by the transcript which were not presented to the trial court.
The matter to be determined in this case goes beyond the questions as to whether the conviction was proper and legal because it is disclosed by the record and exhibits submitted that one of the co-defendants, Walter Willis, has since his conviction and sentence made a confession in which he details the circumstances of the homicide as follows:
"I, Walter Willis, being first duly sworn upon oath says: Mr. W.A. Anglin on Sunday evening, July 10, 1911, asked Boy Gaines while we were at Square Hornbeak's store about one mile east of Bayou creek what he done with his whisky, Boy told him he did not have it, and Mr. Anglin called me and asked me if I had it. I told him I did not and I told him `if Boy has it I will get it,' and about that time Boy went down the road towards home, towards where the whisky was lying by the side of the road where he left it, when we got up there he had taken the whisky and got out in the field with it, and we did not see him there, I went out there where he was and told him Mr. Anglin wanted his whisky, and he said he did not have it, I told him he had it and `let's carry it on and give it to him,' and he said `Come, go with me,' and we went across the field, and did not see Mr. Anglin when we first come into the road, and went on down across until we come in the lane, and there we saw him going down the lane; this was about 9 o'clock that night, and after we left Hornbeak's store and Mr. Anglin was on the way to the creek, Vinnie was in the buggy with him, we got out in the road and seen him going down the lane, Boy runs and overtakes him and told him to wait. He wanted to give him his whisky, and when he got down to the creek, we got in the buggy with him just before we got to the woods on the east side of the Bayou; I was sitting in the buggy and Boy Gaines was sitting in my lap driving the team, Mr. Anglin and Vinnie was in there also; when we got down to the creek Boy asked Mr. Anglin to get out, he wanted to talk with him, and when he got out, he hits Mr. Anglin up by the side of the neck with his fist and knocked him down jumped on him and went to beating him. Vinnie jumped out and run. I got after her and *Page 378 
I hit her with a stick and knocked her down and throwed her in the creek. Boy Gaines rolled Mr. Anglin in the creek. After he put him in the creek I caught hold of the lines and Boy Gaines takes the whip and whipped the horses into the water. The horses jerked me in the creek, I swam out on the west side, goes down to the bridge and met Boy down there. Boy Gaines gave me $15 and told me to keep my mouth about it and don't tell nobody, and me and him goes on up to his house and goes to bed. I gets up next morning; goes on home. Until that night I never heard a word said about robbing Mr. Anglin or killing him and there was nothing said about it there until after Boy Gaines takes Mr. Anglin out of the buggy. Lawrence Gaines was not with us at all; there was no one there except us two and Vinnie and Mr. Anglin; no one knew we were going to do this; I did not know where Lawrence Gaines was at that time and Susan Gaines did not know anything about it that I know of; I heard nothing about Susan having any connection with it; Susan Gaines made no suggestions about robbing or killing Mr. Anglin. Vinnie did not know anything about us going to do this that I know of. Boy Gaines told me at Ardmore after the conviction while we were in Ardmore. We had a conversation and I asked him why he put Lawrence Gaines there when he knew he was not there; I said why did you want to put Lawrence Gaines there and he said I was after saving myself. Mr. Anglin was pretty drunk at the time we got in the buggy with him below Square Hornbeak's store. Myself, Boy Gaines, Mr. Anglin and Vinnie Gaines rode in Mr. Anglin's buggy to Hornbeak's store, and we got out just as we got to the store, and he drove up the road a piece and returned, and it was while we were in the buggy coming from Rock creek that this whisky was taken out and was while at the store there we had this little fuss about the whisky; we just pitched it out of the buggy and went back and got it. I never told Geo. Henry or anybody else about this until after I was convicted.
"Realizing that I am now sentenced to be hanged; that the time is now set, and that I make this statement that the truth may be known; that justice may be done; that nobody will be punished that is not guilty. Susan Gaines never knew, so far as I know, but what Vinnie Gaines, her *Page 379 
daughter, was drowned in the creek with Mr. Anglin while crossing the creek."
The affidavit shows that the same was made on the affiant's own motion and without any conference or arrangement with this accused or any other person.
On a careful examination of all the facts and circumstances as shown by the transcript of the testimony taken in the case, I think that they support and corroborate this confession and not the testimony of Boy Gaines, the other admitted accomplice.
Therefore, it is my opinion that you cannot afford to permit the death penalty to be inflicted on Lawrence Gaines, not on account of any error of law occurring at the trial, but on account of the lack of sufficient corroborating proof of the testimony of Boy Gaines, the accomplice, and the subsequent confession of Walter Willis, another accomplice, which is before you. I cannot conclude this communication without saying, however, that in my judgment it was a miscarriage of justice that Boy Gaines did not receive the death penalty instead of Lawrence Gaines.
It is my recommendation that you carefully investigate the facts and circumstances surrounding this conviction and the facts and circumstances which have developed since the trial, in order that you may be able to arrive at a just and righteous conclusion as to what, if any, clemency should be extended to Lawrence Gaines, for it is only through you, as the Chief Executive, and no one else, that he can secure the relief which in my opinion he is entitled to receive. Respectfully submitted.